FANNIE MEYERS ET AL., Appellants, v. WILLIAM JOSEPH DRAKE ET AL. —24 S. W. (2d) 116.

Division One, February 3, 1930.

614

*Rendlen & White, E. L. Alford* and *Branham Rendlen* for appellant.

*J. O. Allison, George A. Mahan, Dulany Mahan.* and *E. T. Fuller* for respondents.

618

SEDDON, C.—This is an action under the statute (Sec. 525, R. S. 1919), commenced on October 21, 1924, to contest the validity of the will of Madison C. Drake, deceased (who died a bachelor, at the age of 75 years, on January 7, 1924), which will was admitted to probate by the Probate Court of Ralls County on January 24, 1924. The testator, Madison C. Drake, after making a bequest of $500 in cash to Darwin Brooks, a boy friend of the testator, and a bequest of $1,000 in cash to William Joseph Drake, a nephew of testator, devised his residence realty, comprising approximately three-fourths of an acre, and situate in the town of Oakwood, in Ralls County, Missouri, to his sister Drucilla M. Hawkins; and the residuary estate, real, personal and mixed, of the testator, was bequeathed and devised

to William Madison Hawkins, a nephew of testator and the son of testator's sister Drucilla M. Hawkins. The testator, by his will, nominated William Madison Hawkins as the executor of his estate, and such appointment was made by the Probate Court of Ralls County. The will was signed and published by the testator on September 9, 1922, and the signing and publication of the will was witnessed by Berryman Henwood and Robert M. Clayton, who attested the signing and publication of the will by subscribing their names to the will in the presence of the testator, and in the presence of each other.

The contestants of the will (who are the parties plaintiff in the action) are Fannie Meyers, Martha Schrage, Mary Dettle and Catherine Rood, nieces of the testator, being the daughters of George W. Drake, a predeceased brother of testator. The parties defendant in the action are the respective beneficiaries named in the will of testator. William Madison Hawkins is named as a party defendant in the capacity of executor of testator's estate, as well as in his individual capacity. The minor beneficiary, Darwin Brooks, having died after the commencement of the action, his surviving parents, J. L. Brooks and Annie Brooks, were substituted as parties defendant in the stead of Darwin Brooks, deceased.

The petition is conventional in form, alleging that the paper writing of September 9, 1922, purporting to be the last will and testament of Madison C. Drake, is not the will of said testator, for the reason that the said testator, at the time of the alleged signing and execution of such purported will, was not of sound mind and had not mental capacity sufficient to make a will, and for the further reason that the purported making and signing of said written instrument was procured by the undue influence of the defendant and chief beneficiary, William Madison Hawkins, upon and over the mind of said testator. The petition prayed that the issue whether said instrument of writing is, in fact, the last will of testator be submitted to a jury, and that said purported will be declared void and of no effect. The joint answer of defendants joined the issues raised and presented by the petition.

At the conclusion of the evidence, the trial court instructed the jury that there is no evidence in the cause as to undue influence, upon the part of William Madison Hawkins, over the mind of the testator, and, as to such issue or claim, their verdict must be to sustain the will of testator. The issue or claim of testator's mental incapacity to make the will was submitted to the jury, resulting in a finding and verdict by nine of the jurors that the instrument of writing dated September 9, 1922, is the last will and testament of Madison C. Drake, deceased, and judgment was entered in accordance with such verdict. After an unsuccessful motion for a new

620

trial, the plaintiffs (contestants) were allowed an appeal to this court. This court takes jurisdiction of the appeal for the reason that the record discloses that the pecuniary value of testator's estate, in controversy, exceeds the sum of $7,500.

The proponents of the will (defendants) educed the testimony of Berryman Henwood and Robert H. Clayton, the attesting witnesses to the signing and publication of the will, both of whom testified that the will was signed and published by the testator, Madison C. Drake, in their presence; that the testator was of sound mind at the time of the signing and publication of the will; and that they had subscribed their names to the will, as attesting witnesses, at the request and in the presence of the testator, and in the presence of each other.

The witness Berryman Henwood further testified that he was a practicing attorney in Hannibal, Missouri, on and long prior to the month of September, 1922; that Madison C. Drake came alone, and unaccompanied, to the law office of Mr. Henwood in Hannibal early in the month of September, 1922, and requested that Mr. Henwood write his will; that no one else was present in the office at the time; that Madison C. Drake discussed with Mr. Henwood the terms of the contemplated will at considerable length; that he discussed the matter of his property, in a general way, and his relationships, and how he wanted to divide and distribute his property by will; and, furthermore, Madison C. Drake discussed the matter of his relatives, his attachment for certain relatives, and his lack of attachment for other relatives; that, in the course of the conversation, Mr. Drake mentioned the plaintiffs (contestants), and said that he had not been close to them, or had they been close to him, since they had grown up, and he did not feel that they were interested in him; that was why, Mr. Drake explained to Mr. Henwood, he was leaving them (plaintiffs) out of the provisions of his will; that Mr. Henwood, during the course of the conversation, made a memorandum of the desires of Mr. Drake respecting the disposition of his property, from which memorandum Mr. Henwood thereafter dictated the will in controversy to his stenographer; that, several days after the typewritten will had been prepared by Mr. Henwood, Madison C. Drake returned to Mr. Henwood's office and himself, unaided by Mr. Henwood, read the typewritten will, and, after reading the will twice, Mr. Drake signed the will in the presence of both Mr. Henwood and Mr. Clayton, both of whom thereupon attested the signing of the will in the presence of Madison C. Drake; whereupon, Mr. Henwood delivered the will to Mr. Drake, who took the will from Mr. Henwood's office, after it had been enclosed in a large envelope labeled, "Last Will and Testament of Madison C. Drake." Mr. Henwood testified further that he had been reared in the town of Oakwood, and in

the immediate neighborhood where the testator, Madison C. Drake, resided, and had been well acquainted with testator from Mr. Henwood's boyhood until testator's death; that never a month passed that Mr. Henwood did not see testator at least once, and often he saw testator two or three times a month; that, at times, he had been the legal adviser of testator, but that testator never had much business in which he required the advice and aid of a lawyer; that testator was always industrious, and worked at something every day, but that, in the last ten or fifteen years of testator's life, he was what Mr. Henwood would call a "tinkerer," fixing the fence about his home place, feeding and caring for the live stock and poultry thereon, milking the cows and peddling milk about the neighborhood, and driving a horse and buggy about the principal streets of Hannibal; and that Mr. Henwood had never observed testator, at any time during such long acquaintance, "when he did not impress me as being of perfectly sound mind."

Robert M. Clayton testified that he was engaged in the insurance business in Hannibal, and had known testator six or seven years, perhaps longer, before his death; that he had tried, on one or two occasions, to buy from testator a tract of land in Hannibal, owned by the testator and situate at the corner of Fourth and Center streets, opposite the public city park, but that testator had stated that he did not want to sell the land, and he had never been able to get testator's consent to sell the land, which a client of Mr. Clayton desired for a gasoline-filling-station site; that such negotiations for the purchase of the tract of land were had shortly prior to the execution of testator's will; that Mr. Henwood telephoned Mr. Clayton that Mr. Drake wanted him to be a witness to his (Drake's) will, and that he went immediately to Mr. Henwood's office and found both Mr. Henwood and Madison C. Drake there; that Mr. Drake said that he had just made a will, and that he wanted Mr. Clayton "to come up to be a witness to his will;" that witness talked to Mr. Drake about the witnessing of the instrument; and that witness "don't think there was any doubt about his being of sound mind at that time."

The contestants (appellants) educed the testimony of some twenty lay witnesses (including several of the contestants and their respective husbands) tending to show that the real property owned by Madison C. Drake at the time of his death was inherited from a wealthy uncle, one Dr. Hampton; that he created no estate or property by his own thrift and industry; that he did not improve the lands he inherited from his uncle, but permitted them to fall into a state of dilapidation; that he rented, or leased, his real property for a long term of years at a nominal and grossly inadequate rental; that Madison C. Drake could not write, except to write his own

name, and kept no books or accounts; that he was miserly in his habits and spent little, or almost nothing, for food and clothing; that he did not keep his person, or the single room of the house in which he resided, clean; that he kept the windows of his room closed, and barred the windows with heavy shutters, which were continuously kept tightly closed with large iron chains; that mice and vermin were permitted to run about the room, and over the stale food which testator habitually left exposed upon a table in the room; that he spat tobacco juice upon himself, upon the floor and furniture of the room, and upon the bed in which he slept; that his clothing was stiff and slimy with dried tobacco juice; that his body and clothing were dirty and filthy; that he frequently stated that he did not believe in taking baths; that he was inclined toward unnatural sexual practices and was careless in exposing his person to the view of neighbors and passersby; that he was forgetful, in that he would hitch his horse to a buggy, and immediately unhitch the horse, and then ask why the horse was not hitched; that he would make purchases at stores and pay for the purchased articles, and later he would return to the stores and offer to pay for the articles again; that he had certain hallucinations, imagining that persons were prowling about his house at night, and stating that he heard people singing about the house ever since his sister Dora had died (the sister predeceased testator several years); and that he did not recognize certain of his nieces (contestants), when they made infrequent visits to testator's home, and they would have to tell testator that they were his nieces before he was able to recognize them. Contestants' witnesses severally expressed the opinion, based upon the foregoing incidents and circumstances, that plaintiff was of unsound mind, incapable of transacting his personal and business affairs, and lacking in sufficient mental capacity to make a will.

In rebuttal of contestants' evidence, the proponents of the will (respondents) educed the testimony of some thirty-five witnesses, all acquaintances and neighbors of testator, tending to show that testator was industrious, and always capable of attending to, and well understood, his business transactions; that he personally collected the rents from his several properties, and paid the taxes thereon; that he was a regular contributor to the support of the local Methodist church, of which he was an occasional attendant; that, while he dressed plainly, his clothing was clean, and never filthy; that he chewed tobacco, which occasionally would drop on his clothing; that he was never profane or unclean in his speech, or in his habits and conduct; that he promptly paid his debts and looked after the insurance upon his properties, and personally paid the insurance premiums; that he frequently and intelligently discussed current topics and matters of business with his neighbors and acquaintances; that

he was frugal, and saved his income; that he personally fed and attended to the live stock and poultry on his home place, milked the cows and peddled the milk in the neighborhood of his home, and frequently drove his horse and buggy about the main streets of Hannibal, while attending to his business transactions; and that he kept a deposit of money, at times, in the Hannibal National Bank, and attended personally to his transactions with the bank. The witnesses on behalf of the proponents (respondents) severally expressed the opinion, based upon their personal acquaintance and contacts with testator, that he was of sound mind, and was fully capable of understanding, appreciating and caring for, his business and personal transactions, and possessed the mental capacity to make disposition of his property by will.

I. Appellants, in their brief, concede that ''a sharp question of fact was made by the evidence'' respecting the issue, or claim, of the mental incapacity of the testator to make the will in contest, thereby admitting that such issue was properly submissible to the jury. It is urged by appellants, however, that the trial court erred in not submitting to the jury for determination the issue of undue influence on the part of defendant, William Madison Hawkins, and in instructing the jury, at the request of the proponents and defendants, that ''there is no evidence in the cause as to undue influence upon the part of William M. Hawkins, defendant, upon the mind of the testator; and, therefore, as to that issue your verdict must be to sustain the will.'' Appellants argue that, even if it be true that ''there is no direct or positive evidence of that fact (i. e., of undue influence),'' yet ''there are facts and circumstances in the record which are difficult to explain upon any other theory; the exercise of undue influence upon a testator in the execution of his will may be proved by circumstantial evidence.'' Appellants rely strongly upon the opinion of this court, en banc, in Fowler v. Fowler, 318 Mo. 1078, 1086, 2 S. W. (2d) 707, 710, and cases cited therein, in support of the foregoing (quoted) statement and argument, and assert that the evidence herein is closely similar, if not almost identical, to that found in the Fowler case, as respecting the issue of undue influence, upon the part of the chief beneficiary of the will, over the mind of the testator.

Appellants quote the following portions of the evidence, as related by certain of contestants' witnesses and found in the record, which they claim is ample and sufficient evidence to have entitled them to a submission of the issue of undue influence, under the ruling of this court, en banc, in the Fowler case, supra: ''Uncle Mat (testator) said Will Hawkins collected some of his rents; said Willie Mat Hawkins collected rents over there in South Hannibal from

a brick house and that he (testator) had not gotten his money yet; he (testator) told me he loaned William Mat Hawkins $500 to go in the creamery business." "Q. What did he (testator) say about doing what Willie Hawkins told him to do, if he told you anything? A. He could not do anything without the sanction of what Willie (Hawkins) said. Q. What did Mr. Drake (testator) say? A. He said he could not transact anything without having his (Hawkins') sanction to it." "He (testator) said Willie Hawkins kept hanging after him to make him some loans in the business —in the dairy business; finally went in $500 to get rid of him and lost it all; he (testator) says, 'Never get any more of my money; got all he will ever get.' " "He (testator) said, 'I can't go anywhere until I tell Will Mat Hawkins I am going. . . . I have always got to tell Will Mat Hawkins what I am going to do, or when I go anywhere; if I don't he gets mad.' " "Mr. Drake (testator) told me that Mr. Hawkins had rented his property, and that Hawkins collected the rents. Mr. Drake was telling me he had been over there and he could not collect the rent, and he said Mr. Hawkins would have to collect that rent, he (Hawkins) rented the place." "He (testator) mentioned Willie Mat Hawkins. Said he had made another will and was not going to leave Willie Mat everything that he had; he said that a number of times. He told me Mr. Hawkins had approached him about another loan. He said he was not going to let him have any more money. He said he did not care for Willie Mat's son spending all his money. At that time he never said a word about making another will, but he said he had written another will and was not going to leave Will Hawkins everything."

In the Fowler case, supra, there was strong and substantial evidence that testator's disposition of mind, as previously expressed by him, was hostile to the chief beneficiaries named in the will; that they had previously displayed anxiety that testator should make his will; and that he was taken to their home, hopelessly sick and mentally weak, where testator was exclusively under their care and control for seven or eight days, when testator made a will in their favor, directly contrary to his intention theretofore often expressed; and that testator died, shortly after making his will, from the fatal ailment with which he was stricken when taken to the home of the chief beneficiaries named in the will. While the chief beneficiaries of the will were absent on the day the attorney who prepared the will made a memorandum of testator's desires, and were likewise absent on the next day, when the will was read to testator and signed by him, yet it was held in the Fowler case that it was a matter for a jury to say, under the foregoing circumstances in evidence, whether the will was the result of undue influence over the mind of the testator, exercised by the chief beneficiaries of the will.

The record in the instant case, however, does not present such a strong chain of circumstances as was shown in evidence in the Fowler case. While there is some testimony on behalf of the contestants herein that William Madison Hawkins frequently called at testator's home (as often, maybe, as three times a week, and usually every Sunday), yet the testimony of contestants' witnesses was that the chief beneficiary of the will, William Madison Hawkins, neither resided with testator, nor caused testator to be removed to Hawkins' own home, prior, or subsequently, to the making of the will, but that testator always had resided in his own home, until the very day of his death, using one room for himself, and letting out the remaining rooms to other parties, none of whom was made a beneficiary by the will. The evidence furthermore shows, without any contradiction, that testator, alone and unaccompanied, made two visits, at least, to the office of Mr. Henwood, the attorney who prepared the will at testator's request, in connection with the preparation and execution of the will, and that he discussed with Mr. Henwood the matter of his attachment for certain relatives, and his lack of attachment for other relatives, mentioning the several contestants, and explaining to Mr. Henwood, as his reason for leaving the contestants out of the provisions of his will, that testator had not been close to them, or had they been close to testator, since they had grown up, and that testator did not feel that the contestants were interested in him. The evidence discloses that the contestants, for several years prior to testator's death, resided in the State of Illinois, and that testator saw and heard from them only occasionally and infrequently. At most, the testimony upon which appellants (contestants) rely, as tending to show undue influence and that a fiduciary relation existed between testator and the chief beneficiary of his will, was mere hearsay, consisting of statements purporting to have been made by testator, some years prior to his death, tending to show the fiduciary relation. The mouth of testator has been closed by death, and whether he made the statements attributed to him by contestants' witnesses is dependent solely upon the veracity of the persons who testified to such statements of the testator. If a fiduciary relation existed in fact between testator and the chief beneficiary of his will, such fiduciary relation was readily capable of establishment, without resorting to hearsay testimony, and by offering direct and positive evidence of the acts and conduct of the parties.

We have given close study to the evidence herein, and we find no substantial evidence of undue influence, upon the part of William Madison Hawkins, or any one else, exerted over the mind of testator. The burden of proving undue influence rests upon the contestants, and an unequal testamentary disposition of testator's property, or

a failure by the testator to make provision for certain collateral relatives and kindred, while at the same time making testamentary provision for other collateral relatives and kindred, is insufficient, in and of itself, to establish undue influence. The trial court therefore committed no error in instructing the jury, at the request of proponents of the will, that there is no evidence of undue influence in the cause, and, as to that issue, their verdict must be to sustain the will. The trial court rightly and properly charged the jury upon the issue, or claim, of undue influence. [Winn v. Grier, 217 Mo. 420, 459; Turner v. Anderson, 236 Mo. 523, 540; Nook v. Zuck, 289 Mo. 24, 41; Smarr v. Smarr, 319 Mo. 1153, 1165.]

II. Appellants complain of error in the procedure adopted by the court upon the trial of the cause. It is said that the proponents were not content with making a prima-facie case by merely offering the testimony of the attesting witnesses to the will, tending to show only the formal execution of the will and the mental capacity of the testator at the time he signed and published the will; but that the trial court erroneously permitted the proponents to further examine the attesting witnesses, Henwood and Clayton, respecting the conduct, habits and business transactions of the testator, covering a period of many years prior, and subsequently, to the execution and publication of the will.

It appears from the record that, upon the conclusion of the testimony of the attesting witnesses, Henwood and Clayton, the proponents, having made a prima-facie case, rested. Thereupon the contestants insisted and moved that proponents be required by the court to put in all of their evidence, before the contestants should be required to offer any evidence to overcome the prima-facie case made by proponents. The trial court overruled the contestants' motion, and required them to introduce their evidence for the purpose of overcoming the proponents' prima-facie case made by the two attesting witnesses to the execution and publication of the will. Upon the conclusion of contestants' evidence, the proponents were then allowed to offer evidence in rebuttal of contestants' evidence. It is urged by appellants that the procedure so adopted by the trial court resulted in a tactical advantage to proponents, which advantage was highly prejudicial to contestants.

As a general rule, the order of introducing evidence upon the trial of a cause is a matter which lies in the sound discretion of the trial court, and unless the trial court has palpably abused such discretion, to the prejudice of the complaining party, an appellate court will not interefere with the trial court's action, or hold such action of the trial court to constitute reversible error. [Dozier v. Jerman, 30 Mo. 216, 220; Seibert v. Allen, 61 Mo. 482, 487; Scullin Steel Co.

v. Iron Co., 308 Mo. 453, 479.] While our uniform practice requires (in every case contesting the validity of a will) the making of a prima-facie case by the proponents of the will, and then requires the contestants to put in their case, nevertheless, it does not shift the burden of proof as to the mental capacity of the testator, and such burden remains with, and rests upon, the proponents of the will throughout the entire trial, and consequently the proponents have the right to open and close. [Major v. Kidd, 261 Mo. 607, 625; Berkemeier v. Reller, 317 Mo. 614, 622; Smarr v. Smarr, 319 Mo. 1153, 1165.] We see nothing prejudicial to appellants-contestants in the trial court's order of procedure, and find no reversible error therein.

III. The contestants proffered the testimony of Joseph F. Barry, an attorney, who was appointed by the Probate Court of Ralls County to appraise the value of testator's estate for the purpose of assessing the statutory inheritance or transfer tax. The witness identified the inventory and appraisement of the value of testator's estate, amounting to $33,990, as filed by the executor, William M. Hawkins, in the Probate Court of Ralls County, and the trial court allowed such instrument to be put in evidence by contestants. Thereupon counsel for contestants inquired of the witness, Barry, if he "had a talk with William Hawkins, the defendant in this case, and chief beneficiary under the alleged will of Madison C. Drake, about the $6,000, par value, of Government bonds." The proponents objected to the inquiry upon the ground that it did not bear upon any issue in the case, and the objection was sustained by the trial court. Contestants then offered to prove by the witness, Barry, that he had asked William M. Hawkins if there were some U. S. Government bonds which were a part of the assets of testator's estate, and that Mr. Hawkins claimed the same as his own property, stating to witness that the bonds had been given to him (Hawkins) by his uncle, Madison C. Drake, a short time prior to his death, and that he, Hawkins, claimed them as his own property and that they constituted no part of the assets of the estate of Madison C. Drake; and, furthermore, that the witness, Barry, had asked Mr. Hawkins if there was some cash or evidences of debt, amounting to $600 or $700, belonging to the Drake estate, which had not been listed and inventoried by Mr. Hawkins, as executor of the estate, and that Mr. Hawkins, with reluctance, admitted there was, and claimed that, through inadvertance, he had failed to list the same as part of the assets of the estate. The aforestated offer of proof was objected to by defendants upon the ground that the proffered proof was immaterial and had no bearing upon the issues in the case, and the objection was sustained.

The trial court also refused to admit in evidence the report of the inheritance tax appraiser, Barry, as filed in the Probate Court of Ralls County, and tendered in evidence by the contestants. Appellants assign error in such rulings and action of the trial court, claiming that the proffered and rejected evidence has a direct bearing upon the issues of the mental incapacity of testator, and of undue influence upon the part of William M. Hawkins.

The appellants cite no authority in support of their claim and assignment of error. We perceive no reversible or prejudicial error in the rulings and action of the trial court respecting the matters complained of by appellants. Strictly speaking, the assessment of the inheritance or transfer tax does not directly involve the administration of a decedent's estate; the proceeding is one, not against the property or estate of decedent, as such, but is against the interest or property right which an heir, legatee, devisee, grantee, or donee has in the property formerly held and owned by the decedent, whether transferred by will, by the laws of intestacy, or by deed or gift made within two years prior to decedent's death, and without adequate valuable consideration—this is to say, made in contemplation of decedent's death. Consequently, it has been held by this court that the assessment of the inheritance or transfer tax should be postponed until the final determination of a will contest proceeding, for the reason that the parties whose interests or property rights may be ultimately subject to the tax cannot be ascertained or known until the final determination of the will contest proceeding. [In re Bernero's Estate (Div. 2), 197 S. W. 121.] Furthermore, it would seem to our minds to be wholly immaterial, so far as involves the issues in the present action, whether William M. Hawkins claims to be the owner of the Government bonds, if any there be, formerly possessed by his uncle, Madison C. Drake, as the donee of a gift of the bonds from his uncle, or as the residuary legatee named in the uncle's will. But, even if the proffered and rejected evidence be deemed properly admissible, which we do not concede, it is of so little importance, and has so little bearing upon the issues involved in the instant cause, that it could not possibly have prejudiced the rights of appellants, and hence does not justify a reversal of the judgment. [Coats v. Lynch, 152 Mo. 161, 168.] Besides, the statute (Sec. 1513, R. S. 1919) requires that neither this court, nor any of the Courts of Appeals, shall reverse a judgment of any trial or other inferior court, unless we shall believe that error materially affecting the merits of the action was committed by the trial court. The error, if any there be, claimed to have been committed by the trial court, was harmless, in our opinion, and did not materially affect the merits of the present action, and therefore we are constrained to follow and obey the mandate of the statute.

IV. Upon the conclusion of all the evidence (that is to say, after proponents had made their prima-facie case, and the contestants had followed with their evidence in chief, and proponents had closed with their rebuttal evidence, in the respective order of procedure just stated), counsel for contestants then stated to the court that he desired to "cross-examine" the defendant, William M. Hawkins, who had not been called as a witness by either the proponents or the contestants. The court thereupon inquired of counsel for contestants whether he desired to call the defendant, William M. Hawkins, as a witness in rebuttal, and counsel replied: "We want to examine him under Section 5412, Revised Statutes 1919, subject to the rules of cross-examination." Whereupon, the court ordered that the jury be taken from the courtroom, and the jury left the room. The court then requested counsel for contestants to state the purpose and scope of the requested examination of the defendant, Hawkins; whereupon counsel stated in detail what he purposed to show by the testimony of the defendant, and the court stated that such matters of testimony, if admissible at all, were admissible as part of contestants' case in chief, and not in rebuttal of the evidence proffered by the defendants and proponents. After a colloquy between the court and counsel for contestants, the court remarked: "I have not ruled on any matters yet. Perhaps defendant will consent to take the stand. If so, it is not necessary to rule on it." Thereupon counsel for proponents objected "to the request and demand of plaintiffs' counsel at this time to cross-examine, or to examine at all, defendant, William Madison Hawkins, for the reason that the request and demand for him to take the stand is untimely, and for the further reason that the matters suggested by counsel—that he desires to inquire about—were all matters, if competent or admissible in evidence at all, that were proper evidence in chief in their case, and not in rebuttal; and because there is no rule of law or evidence which gives them the right to cross-examine, or to make the defendant their witness in rebuttal, for the matters of evidence suggested." The objection was sustained by the court, and the record before us shows no exception to have been taken, at the time, to the ruling and action of the court sustaining the objection, or to have been saved by the bill of exceptions filed by the contestants in the trial court. While appellants assign the aforestated ruling and action of the trial court as reversible error, we are of opinion that such claim of error is not properly before us for review. In order that we may review, on appeal, a ruling of the trial court made in the course of the trial, "the exception must be saved to the specific ruling in the progress of the cause." [Harrison v. Bartlett, 51 Mo. 170.]

But, aside from the failure of the appellants to take and save an exception (at the time) to the specific ruling of the trial court complained of, we see no reversible error in the trial court's ruling. The statute (Sec. 5412, R. S. 1919), upon which appellants rely, reads as follows: "Any party to any civil action or proceeding may compel any adverse party, or any person for whose immediate and adverse benefit such action or proceeding is instituted, prosecuted or defended, to testify as a witness in his behalf, in the same manner and subject to the same rules as other witnesses: *Provided,* that the party so called to testify may be examined by the opposite party, under the rules applicable to the cross-examination of witnesses."

Such statute does not purport to change the order of the introduction of evidence in a civil action or proceeding, or allow to a party the right and privilege of calling an adverse party to testify as a witness in his behalf at a time that is inconsistent with the orderly procedure of the trial of such an action. Under the statute just quoted, the defendant, William M. Hawkins, was amenable to a subpoena to appear as a witness in the cause in behalf of the contestants, in the same manner as other witnesses (not parties) in the cause. For reasons best known to contestants, however, they did not request, or seek to compel, the defendant, Hawkins, to appear and testify as a witness in their behalf at the time the contestants made their case in chief, although counsel for contestants stated to the court that the defendant, William M. Hawkins, was present in the courtroom throughout the trial, which lasted some four or five days, and until the morning of the last day of the trial, when it would appear from the record that said defendant was momentarily absent from the courtroom. It may have been that contestants believed that the proponents would call the defendant, Hawkins, as a witness, and thereby contestants would have been afforded the opportunity and privilege of cross-examining the defendant, Hawkins; but, be that as it may, the proponents did not call the defendant, Hawkins, as a witness in the cause, and contestants had no good reason to rely upon proponents calling the defendant as a witness.

In 38 Cyc. 1352-1354, it is said: "In order to prevent injurious surprises, and annoying delays in the administration of justice, rules of practice, looking to the orderly introduction of evidence by the respective parties, are essential. The trial has its regular stage of process, and the evidence should be introduced with reference thereto. 'Otherwise, the trial will be in perpetual confusion.' . . . Ordinarily, the rebutting evidence offered by him upon whom the burden of proof rests concludes the introduction of evidence, but not always. Within the discretion of the court, for good reasons, in furtherance of justice, the other party may be permitted to introduce evidence in response to that called forth by the rebuttal testimony, but nothing

further in chief, except by permission of the court. The rules set forth . . . are rules of practice, and are considered as under the control of the court, and subject to be varied in the exercise of a sound judicial discretion. They must be enforced or relaxed by the court in furtherance of justice, and are not to be applied with such technical precision and unbending rigor as to produce injustice; and it is almost universally held that it is discretionary with the court whether it shall admit or reject evidence which is not offered in accordance with the rules prescribing the stage of the trial at which it must be offered, and that the exercise of this discretion . . . is not assignable as error except in a clear case of abuse of such discretion.''

The action of the trial court complained against by the appellants was discretionary, and we cannot say that the court abused the discretion in making the ruling complained of.

V. Appellants assign error in the giving of Instruction 4, at the request of defendants, which instruction reads: ''The court instructs the jury that to render testator competent to make a will, the law does not require the same degree of understanding or mental capacity necessary to make a contract or manage his estate, nor any particular degree of understanding, but he must have sufficient understanding or intelligence, at the time of making or executing his will, to comprehend the nature and extent of the transaction he is, at the time, engaged in, to know his relatives and natural objects of his bounty, the nature and extent of his property, and to whom he desired to and was giving it; and, if you find from the evidence, that Madison C. Drake possessed these requisites, at the time he signed the instrument of writing mentioned in the pleadings and the evidence as his will, you must find for the will.''

At the request of the plaintiffs-contestants, the court gave to the jury Instruction A, which reads: ''In determining the issues of whether or not Madison C. Drake was of sufficient soundness of mind to make a will on the 9th day of September, 1922, before you can find in favor of the proposed will, you must believe from the greater weight of the evidence that at the time of the signing and execution thereof, if you find he did in fact sign same in the presence of two witnesses who signed same in said Madison C. Drake's presence, that said Madison C. Drake had sufficient understanding to comprehend the nature of the transaction he was engaged in, and was capable of understanding the nature and extent of all his property, and the reasonable claim, if any, of all persons who may have been naturally and reasonably within the range of his bounty, and to whom he desired to give his property, and realized to whom he was giving it,

without the aid of any other person; unless the defendant has shown by the greater weight of the evidence in this case that Madison C. Drake did possess all these requisites, you should find the issues in the negative and against the proposed will.''

It is urged by appellants that Instruction 4, given at the request of defendants, sets up a wholly different test, or standard, of mental capacity required of a testator from that defined and stated in Instruction A, given at the request of plaintiffs-contestants; wherefore, it is claimed that the said instructions are clearly conflicting, and consequently were confusing and misleading to the jury. Instructions precisely identical in form, words and language with the above-quoted instructions were given on behalf of the opposite and respective parties in Heinbach v. Heinbach, 274 Mo. 301, which was an action under the statute (Sec. 525, R. S. 1919) to prove, or to establish, a will rejected by the Probate Court of Ralls County, and wherein the issue tried and submitted to the jury was the mental capacity of the testator to make a will. Counsel for the respective parties in the present action likewise appeared as counsel for the respective parties in the Heinbach action. While the instructions given on behalf of the respective parties are not quoted *verbatim* in the opinion rendered by Division Two of this court in the Heinbach case, we have ourselves compared the instructions given in that case (as set forth in the printed abstract of record filed in that case) with those given in the present case, and quoted above, and find the instructions given in both cases to be precisely identical in form, words and language. Said Division Two of this court in the Heinbach case (274 Mo. l. c. 321): ''The instructions given for plaintiff and those given for defendant(s) *are entirely in accord and harmonious* upon the issue, and the only issue, presented to the jury, *and agree exactly in the terms used to define that issue.''* (Italics our own.) In our judgment, a hypercritical study and comparison of the instructions numbered 4 and A, aforequoted herein, discloses no real or essential differences in the requisites of mental capacity required of the testator, as defined and set forth in the respective instructions.

Criticism is made of defendants' Instruction 4 because it tells the jury that, to render testator competent to make a will, the law does not require *"any particular degree of understanding"* on the part of the testator. The law, as stated to the jury in the criticised instruction, comports with the rule or principle of law announced by this court in Harvey v. Sullens, 56 Mo. 372, 380, as follows: ''If a person is of sound mind, and capable of managing his affairs, then he may make a will. *The law does not require any particular degree of understanding,* but the person must have sufficient capacity to intelligently know what disposition he is making of his property.''

(Italics our own.) The law as announced and stated in the Harvey case, supra, has been uniformly and consistently followed and applied by this court in many subsequent cases, although (maybe) restated in slightly different words and language. As aptly said by our lately departed brother, Judge LAMM, speaking for this Division of our court, in Crum v. Crum, 231 Mo. 626, 638: "A general definition satisfying the judicial mind in this jurisdiction, must be deduced from many cases, . . . [Citing a number of cases, including Harvey v. Sullens, supra.] In some of these cases the definition of testamentary incapacity is shortened, one judge using one form of words and another another." The definition and tests of mental capacity of the testator, as stated in defendants' Instruction 4, appear to be in harmony with the law as uniformly announced and stated by this court from the time of the rendition of the opinion in the Harvey case, supra, to the present writing of this opinion. But, if there be any omission or inaccuracy in the statement of the law respecting the essential elements of testamentary capacity, as set forth in the proponents' Instruction 4 (and we think there is none), the omission or inaccuracy is likewise common to contestants' Instruction A. Appellants will not be heard to complain of an error or omission in respondents' instruction which is common to their own instruction. [Harvey v. Sullens, 56 Mo. 372, 379; Christian v. Insurance Co., 143 Mo. 460, 468; Ehrlich v. Mittelberg, 299 Mo. 284, 302; Ard v. Larkin (Mo. App.), 278 S. W. 1063, 1069; Munday v. Knox (Mo. Sup.), 9 S. W. (2d) 960, 966.]

Lastly, it is claimed by appellants that proponents' Instruction 4 is argumentative in form and language and is a comment upon the evidence. We cannot agree with appellants in such contention. The instruction makes no reference, direct or indirect, to any of the facts or circumstances in evidence, and the trial court, in such instruction, obviously does not discuss the tendency of the evidence, or any portion of the evidence, or lay any emphasis thereon. Appellants, in support of their contention, place reliance upon the rulings of this court in Post v. Bailey, 254 S. W. 71, 74, and Hartman v. Hartman, 314 Mo. 305, 314, 284 S. W. 488, 490. In the cases just cited, the instructions condemned by this court told the jury, in substance, that "old age, physical weakness, or imperfect and failing memory caused by sickness or old age" are not sufficient to establish the incompetency of the testator, or to invalidate a will, or to justify a finding of the jury that the testator was of unsound mind at the time the will was made. While conceding the correctness of such quoted statement as an abstract rule of law, it was held in the cited cases that the effect of such statement in an instruction was to minimize, if not wholly destroy, the effect of contestants' evidence, which tended strongly to show that testator's mind had been weakened by old age and physical infirmities to such an extent that his memory

had become faulty, unreliable, imperfect and uncertain; hence, it was ruled by this court in the cited cases that the instruction condemned amounted to a comment upon the evidence, when viewed in the light of the particular evidence adduced by the contestants in the cited cases. No such statement of the law as found in the instructions condemned in the cited cases is to be found in the instructions in the instant case. Respondents' Instruction 4 is well enough, and we think that no error was committed in the giving thereof to the jury.

Matters other than those discussed and ruled herein are assigned as error by appellants, but inasmuch as appellants have not briefed such claims of error, or cited authorities in support thereof, we will treat them as abandoned by appellants.

We are of the opinion that the cause was well tried by the court below, and was properly submitted to the jury upon the issue, or claim, of the mental incapacity of testator raised by the contestants, which was the sole issue upon which the action was submissible under the evidence educed. Finding no reversible error in the record before us, the judgment *nisi* must be affirmed; and it is so ordered. *Lindsay* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Ragland*, *J.*, who concurs in the result.